# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-2305

_____

Michael Johnson,                *
                                          *

        Plaintiff-Appellant,       *

                                          *      Appeal from the United States

    v.                              *      District Court for the

                                          *      Western District of Missouri.

AT&T Corp.,                  *

                                          *          [PUBLISHED]

        Defendant-Appellee.      *

_____

Submitted: February 17, 2005
Filed: September 7, 2005

_____

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

After being fired from his job, Michael Johnson filed suit against his employer, AT&T Corporation, alleging race and age discrimination in violation of 42 U.S.C. § 1981 (2000), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e- 2000e-17 (2000), and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010-213.137 (2000). The district court[1] granted AT&T's motion for summary judgment

_____

[1] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

and dismissed the case. Johnson appeals the district court's judgment. After careful review, we affirm.

I.

In 2001 Johnson, a forty-year-old African American male, worked as an account representative for the National Telemarketing Agency ("NTA"), a division of AT&T with a facility in Lee's Summit, Missouri. Another AT&T department, the Consumer Sales and Service Center, was also located at the Lee's Summit facility. On the evening of July 6, 2001, a receptionist at the Consumer Sales and Service Center answered the phone and received a bomb threat. She reported the threat to AT&T's corporate security team and to the Lee's Summit Police Department. The facility was evacuated and searched, but no bomb was found. The police report for the July 6 incident states that the AT&T receptionist who took the call believed that the caller was an African American male between the ages of thirty and forty. Johnson was not at work on that day. Because the July 6 call was made to a number with which mainly AT&T employees would be familiar, there was a suspicion that the caller was an AT&T employee. On the morning of July 7, 2001, another receptionist at the Consumer Sales and Service Center received a bomb threat over the phone. The building was again evacuated and searched, but no bomb was found. Michael Johnson was at work on July 7, allegedly on the phone with a customer. The police attempted to trace both the July 6 and 7 calls, but they were unsuccessful.

The next weekend, on July 13, 2001, an unidentified male called 911 and reported that he had left a bomb at the AT&T Lee's Summit facility. The Lee's Summit police alerted AT&T, and the facility was again evacuated and searched, but no explosives were uncovered. Michael Johnson was at work at the time the police received the July 13, 2001, bomb threat. AT&T records showed that he was logged into the system and on hold waiting for a customer to be transferred to another AT&T department. The police dispatcher who answered the call said that the caller sounded like an African American male between the ages of thirty and forty, that he spoke in

-2-

a calm and slow manner, and that he sounded educated. The police were also able to ascertain that the call came from a cell phone. The next day, July 14, 2001, an unidentified male caller made two calls to 911. The first call was made that morning, and the caller said that he had overheard an AT&T employee named Jeffrey Wright discussing his plans to bomb the AT&T facility. The caller said that Wright was an Hispanic male between the ages of thirty and forty. In the second call, about three hours later, a male caller reported that Jeffrey Wright planned to detonate the bomb between 2:30 and 3:30 that afternoon. Both of these July 14 calls were received before Johnson arrived at work for the day.

In the days following the bomb threats, both the police and the corporate security managers at AT&T investigated the bomb threats. Several people at AT&T checked to see if there were any current employees named Jeffrey Wright and none were found.[2] On July 18, 2001, AT&T was provided with a tape containing a copy of the 911 calls made on July 13 and July 14. Neither Craig Johnson, center director for the National Telemarketing Center ("NTC"), nor Steve McCord, staff manager for the NTC, heard anything that helped them identify the caller. The two receptionists who had received the July 6 and July 7 bombs threats also did not recognize the voice on the 911 tape. They believed that the 911 caller was a different voice than the voice that they had heard on July 6 and 7.

---

[2]Steve McCord, staff manager for the NTA and liaison to AT&T's Corporate Security Department, testified in his deposition that he searched a listing of current employees for a Jeffrey Wright and found none. (J.A. at 204, 407M.) Scott Robinson, the Center Planning and Execution Staff Manager for the NTA and Steve McCord's supervisor, testified in his deposition that he also checked a listing of current employees for a Jeffrey Wright, and found none. He then asked Terri Cooper, a hiring manager, to check for former employees named Jeffrey Wright. (Id. at 196.) Patty Saccone, an AT&T corporate security manager, also testified that she checked a record of current employees for a Jeffrey Wright. (Id. at 668.)

McCord gave the tape to Ronald Johnson, a sales manager for the NTC, who played the tape for his sales team leaders during their weekly staff meeting that morning. Sales team leaders supervised account representatives such as Michael Johnson. No other sales managers were provided with a copy of the tape to play for their sales team leaders. Of the twelve AT&T employees present at the staff meeting, nine[3] recognized the voice as that of Michael Johnson, including Michael Johnson's sales team leader, Lloyd Lopez. Tracy Randolph was the first to recognize the voice. As the first 911 call played, she stated to the group, "That sounds like Michael Johnson." (J.A. at 357.) Including Ronald Johnson, eight others agreed with her. All of those who identified the appellant's voice had worked with him or listened to him while he spoke on the phone with customers. Later, after litigation was initiated, the nine employees who had identified Johnson's voice all gave deposition testimony that they had not been informed before hearing the tape that the police dispatcher had identified the 911 caller as a black male between the ages of thirty and forty.

Ronald Johnson informed Craig Johnson that several employees had identified the voice on the tapes. Over the next few days, all nine employees composed and typed statements in which they reported that they were fairly confident that the voice on the tape was that of Michael Johnson. The statements were witnessed by Patty Saccone and/or Steve McCord. When the appellant returned to work on Saturday, July 21, 2001, he was called to a meeting with AT&T Corporate Security Manager Patty Saccone. Much of what occurred during his meeting with Saccone is disputed. Johnson alleges that he was not initially told that it was a disciplinary meeting or that he was suspected of having made the bomb threats and that Saccone spoke to him in an intimidating and aggressive manner. He also alleges that Saccone told him that

[3] The nine employees who identified Michael Johnson's voice on the tape were Tracy Randolph, Lloyd Lopez, Barbara Rogers, Barbara Smith, Jo Pinkins, Peri Turner, Heather Shepard, Jill Reynolds, and Ronald Johnson. (J.A. at 119. ) Tracy Randolph, Barbara Rogers, Jo Pinkins, and Ronald Johnson are African American. Three other sales team leaders did not recognize the voice on the tape.

she had traced the calls to his cell phone, that the voice on the tape was that of a black male and AT&T knew that it was him, and that he should just tell her why he had done it. Johnson repeatedly denied any involvement in the bomb threats. Nevertheless, Craig Johnson decided to terminate Michael Johnson, relying on the identifications of Michael Johnson by the nine employees.

After Johnson was terminated, the police were able to trace the cell phone numbers used to call 911 on July 13 and 14, and neither number was connected to Johnson. Johnson's cell phone records also did not show any calls to AT&T or to 911 on the dates and times in question. Two of his coworkers, Kendra Thomas and Tyshecia Baskin-McGrone, submitted affidavits in March 2004 stating that they each saw Johnson at work on July 13 and July 14, 2001, that they talked to him during the evacuations, and that they never heard or saw him use his cell phone at work.

After obtaining a right-to-sue letter from the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission, Johnson filed suit in federal court in September 2002. On April 5, 2004, the district court granted AT&T's motion for summary judgment. Applying the burden-shifting analysis to the race discrimination claim, see <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the court held that Johnson had not established the fourth prong of the prima facie case because he had failed to explain his assertions or support his assertions with evidence permitting an inference of unlawful discrimination. Next the court stated that even if Johnson had established all four prongs of the prima facie inquiry, AT&T had articulated a legitimate, nondiscriminatory reason for terminating Johnson–AT&T believed that Johnson had violated its code of conduct by making bomb threats–and Johnson had failed to show that AT&T's proffered reason was pretextual. As to Johnson's claim of age discrimination, the court found that he had established a prima facie case, but the claim again failed because AT&T had articulated a legitimate and nondiscriminatory reason for the termination, and

Johnson had not shown pretext. The court denied Johnson's motion to alter or amend the judgment, and Johnson now appeals.

## II.

We review de novo a district court decision granting a motion for summary judgment, using the same standard as the district court and construing the record in the light most favorable to Johnson, the nonmoving party. Chambers v. Metro. Prop. and Cas. Ins. Co., 351 F.3d 848, 852 (8th Cir. 2003). Summary judgment is appropriate only if the evidence establishes that there exists no genuine issue of material fact and that the moving party, AT&T, is entitled to judgment as a matter of law.[4] Id. at 853; Fed. R. Civ. P. 56(c).

Because Johnson relies upon circumstantial evidence of discrimination, we assess both the Title VII race discharge claim and § 1981 discharge claim using the burden-shifting framework of McDonnell Douglas, 411 U.S. at 802. See Kincaid v. City of Omaha, 378 F.3d 799, 806 (8th Cir. 2004) (stating that the McDonnell Douglas analysis applies to Title VII and § 1981 claims); Putman v. Unity Health Sys., 348 F.3d 732, 735 n.2 (8th Cir. 2003) (same). In order to establish a prima facie case of race discrimination under McDonnell Douglas, Johnson must show that (1) he belongs to a protected class; (2) he was qualified for his position as an account

---

[4]Johnson argues in his brief that the district court failed to apply Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), to his claim at the summary judgment stage. The Supreme Court held in Desert Palace that direct evidence of discrimination is not required in order to merit a mixed-motive jury instruction in a Title VII case. Id. at 92, 101-02. However, as Johnson acknowledged during oral argument, we have already addressed and resolved this question, holding that "evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues." See Griffith v. City of Des Moines, 387 F.3d 733, 735 (8th Cir. 2004). Therefore the holding of Desert Palace does not affect our application of the McDonnell Douglas framework at the summary judgment stage. Id. at 735-36.

representative; (3) he was discharged; and (4) the discharge occurred in circumstances which give rise to an inference of unlawful discrimination. See Tatum v. City of Berkeley, 408 F.3d 543, 551 (8th Cir. 2005); Putman, 348 F.3d at 736. The district court held that Johnson had established the first three elements of the prima facie test, but had not satisfied the fourth element by a showing that the circumstances permitted an inference of unlawful discrimination. We agree.

Johnson protests that the evidence of pretext that he offered was sufficient to satisfy the fourth prong of the prima facie test. See Putman, 348 F.3d at 736 (stating that one way of showing circumstances that give rise to an inference of discrimination is to provide evidence of pretext). Johnson first points to evidence that at the time of the July 13 bomb threat he was on hold waiting for a customer to be transferred to another AT&T division, that his cell phone records show that he did not make any calls to 911 at the dates and times in question, and that AT&T did not interview two of his coworkers who later submitted affidavits that Johnson was with them during the evacuations. We agree with the district court that none of this is sufficient to establish that the discharge occurred in circumstances that permit an inference of discrimination. The fact that Johnson's work phone was logged into the system at the time of the July 13 bomb threat does not establish or suggest that Johnson did not make the call from a cell phone other than his own, nor does it give rise to an inference that race was the real reason for his termination. Several AT&T employees testified that there would be no reason for an AT&T account representative to stay on the line or at his desk while waiting for such a call to be transferred. Second, the fact that Johnson's cell phone records do not show a call to 911 does not permit an inference of discrimination because AT&T did not have Johnson's cell phone records on July 21, 2001, when it made the decision to terminate Johnson, and AT&T has never alleged to have made its decision based on his cell phone records. Instead, AT&T has repeatedly stated that the decision was based on the voice identification of the nine employees. Furthermore, the fact that two of his coworkers came forward in 2004 with affidavits in which they state that they were with Johnson during the

time of the evacuations also does not permit an inference that race discrimination was the reason that AT&T terminated Johnson in 2001, nearly three years earlier. In addition, the bomb threats were made before the evacuation took place, so Johnson's physical location during the evacuation is not relevant to determining whether AT&T believed that he made the phone calls prior to the evacuations.

Johnson also suggests that an inference of discrimination can be drawn from statements that McCord made after the termination. According to Johnson, McCord testified at an unemployment hearing that AT&T had traced the bomb threats to Johnson's cell phone, even though in reality AT&T was never able to trace the calls to Johnson's cell phone. Reviewing the record, we are unable to locate any such testimony by McCord. Instead, Johnson directs the court to the opinion of the unemployment insurance judge, who stated that the 911 calls were traced to a cell phone, which is true. (J.A. at 718.) The opinion does not state that the calls were traced to the appellant's cell phone. Johnson next alleges that McCord testified at a grievance proceeding that Johnson was fired for making a total of four bomb threats– a statement which would have contradicted other statements by AT&T that Johnson was suspected only of making the threats on July 13 and 14. After reviewing the voluminous record, we again conclude that Johnson's allegation is not supported by the record. McCord was asked in the grievance proceeding how many total bomb threats AT&T had received. (Id. at 869.) McCord answered that AT&T had received a total of four bomb threats and gave the dates. (Id.) These statements are not inconsistent with any other statements made by AT&T and therefore do not permit an inference of discrimination. Michael Johnson also says that AT&T indicated to the Missouri Commission on Human Rights that Johnson was fired for making four bomb threats. Again, after reviewing the voluminous and scattered record, we find no such testimony. (Id. at 839-40).

We also agree with the district court that even if Johnson established a prima facie case, he cannot prevail on summary judgment because AT&T articulated a

legitimate, nondiscriminatory reason for terminating Johnson's employment, and Johnson has not established that AT&T's asserted reason was a pretext for racial discrimination. In support of his pretext argument, Johnson reiterates the same "facts" and circumstances that he presented (and which we have rejected) to support his argument that the circumstances gave rise to an inference of unlawful discrimination. In addition, Johnson argues that Saccone made racially motivated comments to him, that Saccone heavily influenced the decision to terminate him, that Saccone influenced and or prepared the statements of the AT&T employees who identified his voice, and that those who identified his voice were not trained in voice recognition or analysis. Johnson argues that these circumstances taken together make it clear that AT&T could not have honestly believed that Johnson made the bomb threats and that instead he was fired because of his race.

AT&T indicated that it terminated Johnson because it believed that Johnson had threatened to bomb its facility. Such a threat would have been in violation of AT&T's code of conduct. Johnson agreed to abide by the code of conduct when he was hired, and he does not dispute the fact that an employee's violation of company policy is a legitimate reason for subsequent termination. See Putman, 348 F.3d at 736. Instead, Johnson argues that AT&T was mistaken in its belief that Johnson made the bomb threats and that AT&T had not conducted enough of an investigation for its belief to be considered reasonable. Contrary to Johnson's assertion, the proper inquiry is not whether AT&T was factually correct in determining that Johnson had made the bomb threats. Rather, the proper inquiry is whether AT&T honestly believed that Johnson had made the bomb threats. See Scroggins v. Univ. of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000); see also Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 n.2 (8th Cir. 1994). Thus even if AT&T had no solid proof that Johnson made the bomb threats, and even if AT&T was mistaken in its belief that Michael Johnson had made the threats, any such mistake does not automatically prove that AT&T was instead motivated by unlawful discrimination. See Kohrt v. MidAm. Energy Co., 364 F.3d 894, 898 (8th Cir. 2004). We have recognized that the showing

of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee. See id. Johnson is also required to show that the circumstances permit a reasonable inference to be drawn that the real reason AT&T terminated him was because of his race. Id.; see also Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133, 146-47 (2000); Spencer v. Stuart Hall Co., 173 F.3d 1124, 1128 (8th Cir.1999).

In this case, there is ample evidence that AT&T honestly believed that Johnson had engaged in conduct meriting his termination, and that AT&T's honest belief was itself based on sufficient admissible evidence. All of the evidence and testimony suggests that the decision to fire Johnson was based on the identification of his voice by his coworkers and that none of those who identified his voice were aware of any description of the caller as an African American man between the ages of thirty and forty. In fact, Johnson does not even argue that the employees who identified him held any racial bias against him or that they had been informed that they needed to identify an African American male of a certain age.

The other circumstances that Johnson presents also fail to establish a triable issue of pretext. First, because Saccone was not the decisionmaker in the case, Johnson would be required to demonstrate some causal relationship between Saccone's statements and Craig Johnson's decision to terminate Michael Johnson's employment. See Kohrt, 364 F.3d at 898; Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779 (8th Cir.1995). Johnson presents no evidence suggesting a causal relationship, and Craig Johnson testified in his deposition that the decision was based on the identifications and was not influenced by any other factors or persons. (J.A. 407G-H.) Second, the fact that the nine employees who identified Johnson's voice were not trained in any method of voice analysis does not establish that AT&T's reason for firing him was pretextual. AT&T could have honestly relied upon the identification of its employees even where the employees were not trained in voice

analysis because all of those who identified the voice were familiar with Johnson's voice from having worked with him. Third, there is no evidence in the record that Saccone prepared any of the statements submitted by the nine employees, and the employees nearly unilaterally testified in their depositions that they prepared their statements themselves, with some direction from management as to what kind of information the statements needed to include.[5] Johnson also suggests that the statements of the managers and sales team leaders are not credible because they had indicated that they "believed" that the voice on the tape belonged to Michael Johnson's voice when they heard the tape on July 18, 2001, but the statements submitted on July 19, 2001, represented that they were all "certain" that it was Michael Johnson's voice. However, the deposition testimony from these employees suggests that the identifications were never tentative or ambiguous.

Johnson also alleged age discrimination in violation of state law. See Mo. Rev. Stat. §§ 213.010-213.137. The MHRA defines "age" as at least forty years but less than seventy years of age, Mo. Rev. Stat. § 213.010, and provides that it is an unlawful employment practice for an employer to discharge any individual on the basis of age, § 213.055(1)(a). We apply the same burden-shifting analysis of McDonnell Douglas to age discrimination claims based on circumstantial evidence of discrimination. Calder v. TCI Cablevision, 298 F.3d 723, 728-29 (8th Cir. 2002) (McDonnell Douglas burden shifting analysis applies to age discrimination claims based on circumstantial evidence); Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885 (8th Cir. 2001) (stating that age discrimination claims under the MHRA are analyzed in the same manner as Age Discrimination in Employment Act claims).

---

[5]There is some evidence in the record that Patty Saccone of AT&T corporate security provided the team leaders with guidance as to what to information they needed to put in their statements. (J.A. at 605, 670.) However, there is no evidence, as Michael Johnson suggests, that Patty Saccone prepared any of the statements herself. With the exception of Ronald Johnson (Id. at 574), each of the employees testified that he or she typed his or her own statements.

Johnson presents precisely the same allegations, arguments, and proof in support of his age discrimination claim as he does in support of his race discrimination claim. Thus for the same reasons that we hold that his race discrimination claim was insufficient to withstand summary judgment, we also hold that the district court properly granted summary judgment with respect to his age discrimination claim.

## III.

For the reasons stated, we affirm the judgment of the district court granting AT&T's motion for summary judgment.

_____