# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-3437

———————

Karen L. Kasper,                              *
                                             *
              Appellant,                     *
                                             *  Appeal from the United States
       v.                                    *  District Court for the
                                             *  District of Minnesota.
Federated Mutual Insurance Company,          *
                                             *
              Appellee.                      *

———————

Submitted: June 22, 2005
Filed: October 4, 2005

———————

Before RILEY, BOWMAN, and BENTON, Circuit Judges.

———————

RILEY, Circuit Judge.

Karen L. Kasper (Kasper) brought this retaliation action against her former employer, Federated Mutual Insurance Company (Federated), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and under the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363.01-363.15. Kasper appeals the district court's[1] grant of summary judgment in favor of Federated. Kasper also filed

———————

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

a motion to correct "a material mistake in the record." We affirm the district court's judgment and deny Kasper's motion to correct the record.

## I. BACKGROUND

Kasper started working for Federated in 1978. In 1998, Federated promoted Kasper to Team Support Supervisor (TSS). As a TSS, Kasper supervised and directed an underwriting team. Kasper's manager, Mike Melcher (Melcher), District Underwriting Manager, twice evaluated Kasper's performance as a TSS. In a June 1999 evaluation, Melcher gave Kasper a "Satisfactory Progress" rating, and in December 2000, Melcher gave Kasper an overall performance rating of "Meets Overall Expectations."

In the spring of 2001, Kasper first learned from another TSS, Denise Miller (Miller), that Greg Johnson (Johnson), Program Manager, engaged in questionable behavior in the workplace. In particular, Miller told Kasper she and Johnson shared "dirty jokes" with each other. In response to learning about the "dirty jokes," Kasper told Miller that Miller should report Johnson's joke-telling to the human resources department or to Johnson's manager. Even though Kasper suggested Miller report Johnson's joke-telling, Kasper did not report Johnson's joke-telling to anyone at Federated.

In early September 2001, Kasper learned about a second incident involving Johnson's questionable behavior in the workplace. One of Kasper's subordinates, Cathy Hall (Hall), told Kasper she saw Johnson rub his penis, and it made her feel uncomfortable. Hall did not want to tell anyone about Johnson's conduct unless it happened again. Kasper did not immediately report Johnson's alleged conduct to anyone at Federated.

As a result of restructuring, in August 2001, Kasper began supervising another underwriting team, and she started reporting to Johnson, who reported to Scott

Goodew (Goodew), Regional Underwriting Manager (RUM). On September 26, 2001, Johnson met with Kasper "[j]ust to get the expectations that [Johnson] would have of [Kasper] out in the open." On September 27, Johnson again met with Kasper.[2] During one of these two meetings, Kasper noticed Johnson "made a gesture" involving the same conduct Hall had reported to Kasper earlier that month.

Following Johnson's meetings with Kasper, Johnson wrote a memorandum to Goodew summarizing what Johnson and Kasper discussed during the meetings. Johnson's memorandum to Goodew stated, in part:

> As we progressed through the conversation and I started sharing my observations as well as yours and other the [sic] TSS's, she was more hurt by the fact these people did not approach her directly and apparently went to the RUM. Although I did not know for sure, I told her I felt that the RUM had approached the other TSS's to get their feedback as opposed to the TSS's coming in to the RUM.
>
> . . . .
>
> I brought up your conversation with her in which you had asked if she understood how to set team goals and hold individuals accountable. She indicated to me that she knew how to do this which was a different

---

[2]The meeting on September 27, 2001, is the subject of Kasper's motion to correct the record. Based on Kasper's deposition testimony that Goodew disciplined Kasper at a meeting on September 27, the district court found Kasper met with *both Johnson and Goodew* on September 27. In her motion to correct the record, Kasper contends she met with *only Johnson* on September 27, and her deposition testimony to the contrary was "a mistake." In support of her motion to correct the record, Kasper submitted typed and handwritten transcriptions of her notes from a meeting with Johnson and Goodew on November 2, 2001. Kasper presented photocopies of these notes to the district court; however, the photocopies are barely legible. Kasper did not present her transcriptions to the district court.

response that [sic] you got. She also stated that she was aware of each person's production although she couldn't come up with a reason why she had not addressed the low producing people on the team.

. . . .

I did share with her that the reason we were not getting help from the other teams was that the other TSS's did not feel that Karen was providing adequate inventory numbers for them to justify the help. She was surprised at this. We ended the meeting with a plan of action to begin the first thing on Friday.

During this same time, other teams complained to Goodew about having to assist Kasper's team.

On September 28, 2001, Goodew sent an e-mail message to his boss, David Bucher (Bucher), Director of Risk Selection, criticizing Kasper's performance in the TSS position and suggesting she might be better suited for a Client Contact Center (CCC) supervisor position:

Karen Kasper- I'm getting the feeling that she does not have a good grasp on the TSS position or at least the TSS position in the Select Express Segment. He[r] counter parts seem frustrated with her too. She is always asking for help but they can not get a feel for the numbers because she never brings them to the table. I have asked them to meet today (9-24) [sic] and to bring all the inventory and key result info.... I'll let you know how that goes. Having said that, she is very enthusiastic and does a good job at trying to motivate her people. She mentioned the other day that she was frustrated and that maybe she needs to look for a change. I'm thinking she may be a good fit for the CCC and a supervisor position there. Very customer service orientated. As guessed Karen did not have numbers. Asked her to go get and then the excuses came in.... she did eventually go get some but how credible they are I'm not sure. She became defensive as I started to push for goals, actions

-4-

and answers to questions. I don't believe she knows how to set goals..... How the heck did she get by for 3 years?

9-26 Stacy and Denise stopped in and were very upset with Karen. She apparently left the meeting and was overheard saying Scott is putting the hammer down and I don't know how he thinks we can establish goals, hold people accountable and push them any harder. This conversation took place with a USS in her team. They said Karen has never brought numbers....just like the other day when Denise asked how many CCP's, she said 2 peoples worth of work. The[y] feel she got by because she had team people delegated to handle all her reports. This is not a good situation and we need to address ASAP!

(ellipses in original).

On October 10, 2001, Kasper told DeeAnn Snaza (Snaza), the Human Resources Manager, she and Hall had seen Johnson touch his penis, but Johnson's behavior did not offend her. Snaza investigated Kasper's report about Johnson's behavior, and on October 23, Federated demoted Johnson. That same day, Snaza wrote a memorandum to Kasper explaining Snaza had investigated Johnson's conduct and, based on the investigation, Federated "will not be moving forward with a formal complaint." Snaza's memorandum also addressed Kasper's delay in reporting Johnson's conduct:

Karen, your decision to communicate this concern about your manager's behavior, at a time when he was providing you with constructive performance feedback, has the potential to look inappropriate and put your motivation in question. . . . The timing of this complaint, in combination with actual facts of the complaint, puts this into question. Karen, we are unable to determine if your handling of this situation was poor decision making or whether your motivation was questionable.

On November 1, Johnson met with Kasper to discuss her performance. At this meeting, Johnson told Kasper she did not know how to hold people accountable. The

next day, both Johnson and Goodew met with Kasper. At this meeting, Johnson, Goodew, and Kasper reviewed the TSS job description, and Goodew expressed his concerns about Kasper's performance. On November 8, Goodew gave Kasper a memorandum reiterating his performance criticisms from the November 2 meeting. In particular, Goodew was concerned about Kasper's "ability to be open and non-defensive to feedback, or not shifting the blame to others and making excuses for [Kasper's] behavior."

On November 9, 2001, Kasper told Snaza that she thought Goodew and Johnson were retaliating against her because she reported Johnson's inappropriate behavior. In response, Snaza advised Kasper that Johnson would be changing positions soon; Johnson would no longer supervise Kasper; in the interim, Johnson would not give Kasper performance feedback; and Goodew would continue to supervise Kasper.

In December 2001, Federated promoted Lisa Kuck (Kuck), who became Kasper's supervisor. Shortly thereafter, Goodew told Kuck that Kasper had performance issues, including coming to meetings unprepared, failing to maintain confidentiality, and failing to provide team direction and support. Kuck kept a written record concerning her interactions with Kasper, including notes of meetings and conversations with Kasper, copies of e-mail messages and memoranda, and logs of Kasper's attendance. Kuck advised Snaza of her record keeping concerning Kasper.

On December 29, Kasper sent a memorandum to Snaza, criticizing Snaza's investigation of Johnson's conduct, reiterating she felt sexually harassed and retaliated against, and requesting a job transfer. In response, Snaza advised Kasper she was welcome to inquire about other job opportunities within the company. Kasper expressed an interest in a CCC supervisor position, and Snaza advised the CCC and placed Kasper's name on a list of employees seeking other positions.

On April 23, 2002, Kuck gave Kasper a memorandum entitled "Expectations," wherein Kuck outlined areas in which Kasper needed improvement, including communicating clearly, providing work direction, researching and responding to work procedure questions, maximizing productivity and teamwork, and managing performance. Kuck also instructed Kasper to provide weekly updates on workload, staffing, pilots, and employee performance.

In June 2002, Kasper and Kuck discussed Kasper's interest in a CCC supervisor position. Due to Kasper's performance problems, Kuck told Kasper she was uncomfortable recommending Kasper as a candidate for a supervisor position, but she was willing to recommend Kasper for a non-supervisory position.

On June 13, Kasper sent an e-mail message to Bucher explaining how she felt retaliated against for reporting Johnson's behavior. Kasper told Bucher she had contacted an attorney, who recommended suing Federated "for retaliation/harassment." Kasper stated she "felt it best to try to resolve it without legal action." Kasper asked Bucher if he could "do anything to help [her] get an interview for the CCC position." Kasper also requested Bucher to remove from her file "all of this false documentation." Kasper added: "If this can't be accomplished soon, I will pursue a lawsuit against Federated and those involved for wrongful treatment and punitive damages."

On September 4, Kuck reviewed Kasper's performance and gave Kasper an overall performance rating of "Needs Improvement." Kuck based the review, in part, on Kasper's lack of fundamental technical knowledge, making it difficult for Kasper effectively to lead and to manage workload and staffing. To improve Kasper's technical knowledge and to "gain a better understanding of coverages and the impact the processing changes have on them," Kuck instructed Kasper to perform more file reviews to enhance Kasper's familiarity with insurance coverages and the work process, sit with the underwriting support specialists, and "use [Kuck] as a resource."

Kuck also noted Kasper did not complete employee performance evaluations on time, she was "not always fully aware of what workload the team has or does not have," and she sometimes was late for work.

On October 7, Kuck placed Kasper on a performance improvement plan (PIP) to improve Kasper's technical knowledge of the underwriting process, structure activities to maximize productivity and efficiency, develop effective working relationships with other employees, demonstrate integrity and professional behavior, and improve Kasper's supervision of her assigned personnel to maximize productivity and teamwork. To improve Kasper's technical knowledge of the underwriting processes, the plan required Kasper to complete fifteen file reviews each month.

The next day, Kasper met with Kuck and Lisa Hyland (Hyland), another Human Resources Manager, regarding the PIP. During the meeting, Kasper requested up to six months of underwriting training in order to perform the file reviews. Kasper explained "without that training, I couldn't complete that task and be set up to win at the same time. I was being set up to fail." In response to Kasper's request, Hyland explained Kasper "could not select to not perform a task that is critical to the TSS role," and Kasper's "refusal to perform the job task left [Federated] with only one option." Kuck and Hyland then terminated Kasper's employment.

Kasper brought this action, alleging Federated discharged her in retaliation for reporting Johnson's inappropriate behavior. The district court granted summary judgment to Federated, concluding Kasper failed to establish a prima facie case of retaliation, and even if she did, no reasonable jury could conclude Federated's reasons for terminating Kasper were pretextual. On appeal, Kasper contends there are genuine issues of material fact precluding the grant of summary judgment.

## II.    DISCUSSION

### A.    Summary Judgment

We review de novo a district court's summary judgment. Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir. 2005). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Shanklin, 397 F.3d at 596. The nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading, but the [nonmoving] party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). We apply the same analysis in reviewing Kasper's claims brought under Title VII and the MHRA. Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 n.5 (8th Cir. 2005); Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001).

Because Kasper presented no direct evidence of retaliation, we apply the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1078 (8th Cir. 2005). Under this burden-shifting framework, the plaintiff first must demonstrate a prima facie case of retaliation. Id. If the plaintiff presents a prima facie case of retaliation, the burden shifts to the employer to rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for its adverse employment decision. Id. If the employer successfully makes this showing, the burden shifts back to the plaintiff to show the employer's proffered reason was a pretext. Id.

To establish a prima facie case of retaliation, Kasper must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. Id. at 1078-79. The parties agree Kasper has satisfied the first and second

elements of her prima facie case of retaliation–Kasper engaged in a protected activity by reporting Johnson's inappropriate conduct to the human resources department on October 10, 2001, and Federated took adverse employment action against Kasper when it discharged her on October 8, 2002. The issue on appeal is whether the district court correctly concluded Kasper failed to demonstrate the third element of her prima facie case–a causal connection between her report of Johnson's inappropriate behavior and her discharge.

### 1.     Causal Connection

Kasper contends she established causation, because she complained about Johnson's conduct before any supervisor criticized her performance. The undisputed facts, however, refute Kasper's contention. On September 28, 2001, nearly two weeks before Kasper's October 10 complaint regarding Johnson's conduct, Goodew sent an e-mail message to Bucher criticizing Kasper's performance in the TSS position. In Goodew's e-mail message, he stated Kasper "does not have a good grasp on the TSS position or at least the TSS position in the Select Express Segment. He[r] counter parts seem frustrated with her too. She is always asking for help but they can not get a feel for the numbers because she never brings them to the table." Goodew also expressed doubt about Kasper's ability to "set goals" and questioned "[h]ow the heck did she get by for 3 years?" The fact Goodew criticized Kasper's performance before she complained about Johnson's conduct weakens any inference of causation. See Erenberg v. Methodist Hosp., 357 F.3d 787, 793 (8th Cir. 2004) (holding the plaintiff failed to show a causal connection between her complaints and her discharge, because the plaintiff was disciplined for the same performance and attendance problems both before and after she made her complaints).[3]

_____

[3]Kasper attempts to create a fact issue regarding the date when she first engaged in protected activity by citing her earlier discussion with Miller about Johnson's behavior in the workplace. Kasper thus contends she first engaged in protected activity in the spring of 2001, when Kasper told Miller that Miller should report Johnson's inappropriate joke-telling to the human resources department or to

Although not dispositive, the length of time between Kasper's protected activity and her discharge further weakens Kasper's claim of causation. "A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 633 (8th Cir. 2005). Federated terminated Kasper's employment on October 8, 2002, nearly a year after Kasper's October 10, 2001, complaint to Snaza about Johnson's inappropriate behavior. "With this lengthy delay, any causal nexus inference tends to evaporate." Shanklin, 397 F.3d at 604 (holding the plaintiff failed to establish causal connection where ten months elapsed between the plaintiff's discrimination charge and her subsequent discharge).

Kasper strives to shorten the gap between her protected activity and the adverse action by arguing that shortly after she complained about Johnson's conduct on October 10, 2001, Federated took escalating adverse and retaliatory action against her, including: (1) Snaza's October 23, 2001, memorandum expressing concerns about Kasper's delay in reporting Johnson's conduct; (2) the November 2, 2001, meeting with Goodew and Johnson, during which Goodew criticized Kasper's performance; (3) Goodew's November 8, 2001, memorandum reiterating his performance criticisms from the November 2 meeting; (4) Goodew's continued management of Kasper's performance; (5) Goodew's selection of Kasper's new supervisor, Kuck; (6) Goodew's informing Kuck he believed Kasper had performance problems; (7) Kuck's "papering" of Kasper's file; (8) the September 4, 2002,

Johnson's manager. However, Kasper never complained to Federated's management-level employees about Johnson's conduct until October 10, 2001. Because Kasper did not complain about Johnson's inappropriate behavior to Federated in the spring of 2001, Kasper did not engage in protected activity until October 10, 2001, when Kasper reported Johnson's inappropriate conduct to Snaza. See Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999) (holding an employee who does not complain of illegal discrimination or imply she was treated unfairly does not engage in protected activity under Title VII).

-11-

performance review in which Kuck gave Kasper an overall performance rating of "Needs Improvement"; and (9) Kuck's placement of Kasper on a PIP on October 7, 2002.

Kasper's evidence, viewed individually and collectively, does not establish Federated terminated Kasper because of her October 10, 2001, complaint about Johnson. To the contrary, the events recited by Kasper reflect a continuation of the performance criticisms raised by Federated before Kasper's complaint. Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation. See Smith v. Ashland, Inc., 250 F.3d 1167, 1174 (8th Cir. 2001). We therefore agree with the district court; Kasper failed to establish a causal connection between her protected activity and her subsequent discharge.

### 2. Pretext

Even if Kasper established a prima facie case of retaliatory discharge, her claim still would fail, because Federated presented a legitimate, non-discriminatory reason for terminating Kasper's employment, i.e., Kasper's insubordination in refusing to perform file reviews without additional training. The undisputed evidence unequivocally establishes Federated discharged Kasper because Kuck and Hyland believed Kasper refused to perform the monthly file reviews without additional training. None of the evidence Kasper presented sufficiently demonstrates retaliatory intent to establish Federated's proffered reason for discharging Kasper is pretext. We will not second guess an employer's decision to discharge an employee who refuses to perform the essential functions of the employee's job. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995) (holding the federal courts do not sit as "super-personnel departments" that re-examine business decisions). Therefore, we conclude the district court correctly granted summary judgment to Federated on Kasper's retaliatory discharge claim.

### B.  Motion to Correct the Record

The district court found Kasper, Johnson, and Goodew attended a meeting on September 27, 2001, during which Johnson and Goodew criticized Kasper's performance.  On appeal, Kasper filed a motion under Rule 10(e)(2)(C) of the Federal Rules of Appellate Procedure to correct or modify the appellate record to reflect only she and Johnson attended the meeting on September 27, and Goodew did not orally criticize Kasper's performance until November 2.

Whether Goodew attended the September 27, 2001, meeting is immaterial.  The uncontroverted evidence clearly shows Goodew criticized Kasper's performance on September 28 in an e-mail message to Bucher.  Goodew's criticism occurred nearly two weeks before Kasper made her October 10 complaint regarding Johnson's inappropriate conduct.  We thus deny Kasper's motion to correct the record.

## III.  CONCLUSION

We affirm the district court's grant of summary judgment to Federated and deny Kasper's motion to correct the record.

_____