# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 06-1156

_____

|  |  |  |
|---|---|---|
| Shirdena M. Twymon, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Wells Fargo & Company, doing | * | |
| business as Wells Fargo Home | * | |
| Mortgage, Inc., | * | |
| | * | |
| Defendant-Appellee. | * | |
| | * | |

_____

Submitted: June 15, 2006
Filed: September 12, 2006

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Shirdena M. Twymon appeals from the district court's[1] grant of summary judgment in favor of Wells Fargo & Company, doing business as Wells Fargo Home

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Mortgage, Inc., (Wells Fargo) on her race-based employment discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Iowa Civil Rights Act of 1965, Iowa Code ch. 216. We affirm.

I.     Background[2]

Wells Fargo recruited and hired Twymon, an African-American, in July 2000 as the Director of Organizational Performance Reporting & Measurement in West Des Moines, Iowa. Twymon's duties at Wells Fargo included responsibility for the performance management system, employee development consulting, statistical measures, and all activities related to organizational performance and organizational change. Twymon was initially supervised by Laura Gillund, Senior Vice President of Human Resources, whose office was in Minneapolis, Minnesota. Janel Cerwick, a human resources professional based in West Des Moines, later assumed supervisory responsibilities over Twymon. On November 30, 2001, Wells Fargo fired Twymon, citing violation of Wells Fargo's Electronic Communication Use System Policy (computer policy) as the reason for termination. Twymon alleges racial animus and retaliation were the real reasons for her termination.

Twymon's alleged violation of Wells Fargo's computer policy came to the attention of Cerwick in November 2001. An employee informed Cerwick that Twymon was using her work computer to assist a co-worker with his master's thesis

---

[2]As in many employment discrimination cases, there are a number of factual disputes. Wells Fargo denies many of the incidents alleged and statements attributed to Wells Fargo employees. However, since this comes to us on a grant of summary judgment, we assume the truth of the plaintiff's properly supported allegations for purposes of our analysis. "We review 'the record in the light most favorable to the nonmoving party,'" Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005) (quoting Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003)),"drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party." Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005).

and complained, generally, about Twymon's excessive personal computer and Internet use. Wells Fargo's computer policy states that "[a]ll company electronic communication systems and/or equipment are the company's property [and are] to be used to facilitate the business of the company." The policy prohibits "[e]xcessive or inappropriate personal use of the company's electronic communication systems and/or equipment" and warns violations of the policy "may subject [an employee] to corrective action, which may include termination of employment." The policy also prohibits "viewing, storing, downloading, or forwarding pornographic images or other perceived obscene, racist, or harassing materials" and "sending electronic mail that is obscene, racist, harassing, violent, or otherwise offensive."

On November 20, 2001, as a result of the employee complaint, Cerwick requested an audit of Twymon's computer hard drive and began investigating her Internet and e-mail usage. On November 26, 2001, Cerwick received the initial results of the audit, which showed that Twymon had visited hundreds of non-work-related Internet sites. Some time later (the record is unclear as to when), Twymon's computer hard drive was found to contain images of nude and partially nude males, as well as close-up views of male genitalia. In addition, Twymon was found to have received an inappropriate image via her work e-mail and to have forwarded the e-mail to her personal e-mail account. Wells Fargo deemed Twymon's alleged actions to be in gross violation of the computer policy and terminated Twymon's employment on November 30, 2001.

Twymon denies she violated the Wells Fargo computer policy and alleges that her dismissal was, instead, motivated by racial animus and in retaliation for complaints she made about racial discrimination. As for her alleged violation of the computer policy, Twymon admits to some personal use of the Internet, but denies accessing the vast majority of hundreds of sites she reportedly visited. As a rationale as to why the audit, which documented Web traffic from the unique IP address registered to Twymon's computer, revealed such usage, Twymon claims that any

employee with a swipe card could have accessed her computer. Wells Fargo contests this claim, noting the Wells Fargo computer system requires each employee to log on using a unique user name, confidential password, and assigned IP address, a procedure Twymon acknowledges.

Although she denies much of the personal Internet use attributed to her, Twymon claims she had permission from Gillund to use her work computer for personal use as Twymon's personal computer was damaged during her relocation to the Des Moines area. Gillund acknowledges giving Twymon permission for "limited personal use" of her work computer as a "temporary accommodation" after her difficult move, but states that after issues related to Twymon's move were resolved, Twymon did not ask for permission for continued personal use. Gillund asserts Twymon received notice regarding the computer policy at least twice during her time with Wells Fargo and signed an acknowledgment indicating she read and understood the policy. Twymon also complains that white employees used their work computers for personal reasons during work hours without any consequences. There is no evidence in the record about the computer habits of other employees, and Wells Fargo states it consistently administers corrective action for violations of the computer policy.

Twymon does not deny her computer hard drive contained photographs of naked men and other inappropriate material, but she denies responsibility for the images. She claims she received two inappropriate e-mails from another Wells Fargo employee and complained to Phil Hall, Director of Employee Relations and an African-American, about the communications and images.

Twymon alleges her experience at Wells Fargo prior to her alleged misuse of the computer system demonstrates she was subject to racial discrimination and retaliation and not actually terminated for computer policy violations.[3]

Twymon was recruited for the Wells Fargo position by an independent executive recruiter. Twymon's recruiting process included a series of interviews, one directly with Gillund. Although Twymon acknowledges that Gillund was "cordial and professional" during her recruitment, Twymon perceived Gillund as "unsupportive, disinterested, distant, [and] cold" from the beginning of her employment. Twymon believed Gillund had not wanted her hired. Twymon claims Gillund did not provide Twymon with the mentorship or guidance that Gillund provided to her white subordinates. Twymon does not provide any specific examples of white employees receiving mentoring from Gillund, but states that Barb Rodriguez, a white employee who worked in Minneapolis, received more attention from Gillund, and Twymon notes she perceived a "marked difference" between how Rodriguez's work and her own were facilitated by Gillund.

As Twymon's employment continued she felt that Gillund favored her white employees. She alleges a double standard existed for white and non-white employees. For example, Twymon alleges that Gillund allowed Caucasian employees, including Rodriguez, to work flexible hours. In contrast, Twymon states she was generally denied the opportunity for a flexible schedule, although she was permitted to

---

[3]The district court correctly noted the evidence submitted by Twymon in support of her claims included inadmissable hearsay. Because we cannot consider inadmissible evidence in rendering our opinion, Twymon's factual allegations supported only by inadmissible hearsay evidence are largely excluded from the recitation of facts. See Shaver v. Indep. Stave Co., 350 F.3d 716, 723 (8th Cir. 2003) (stating "[t]here are limits on what kinds of evidence a judge may consider in reviewing a motion for summary judgment, and inadmissible evidence . . . cannot be used to defeat such a motion" and therefore ignoring such evidence).

telecommute for a week when her mother was ill. Gillund denies Rodriquez worked flexible hours. Nothing in the record reflects the work hours of other employees.

Twymon recalls other incidents she claims demonstrate Gillund's favoritism towards white employees. For example, Twymon alleges Gillund made disparaging remarks about an employee of Polynesian descent. Twymon also recounts an incident where a human resources manager of unknown race allegedly yelled at her. Twymon states she responded by telling the manager she did not wish to be treated in that manner, and Gillund reprimanded Twymon for her response. Gillund allegedly told Twymon, "you don't know your place." In contrast, Twymon alleges that a white employee yelled and spoke disrespectfully to Gillund in a meeting and received no reprimand.

Twymon also complains generally of "rude, condescending, [and] unpleasant" treatment by her co-workers, but does not cite any specific examples. She notes that she reported the boorish behavior to Gillund, who Twymon claims responded by instructing her to learn how to deal with temperamental people. Twymon alleges that she was consistently directed "to be accommodating and nice," while, in contrast, her white colleagues were consistently allowed to behave badly.

Twymon alleges that some of her co-workers did not approve of her dating white men and so they embarked upon a "campaign" to find her a suitable – meaning black – man. Twymon claims she informed Gillund of these efforts, but that Gillund stated she didn't see any problem. Twymon also alleges that Gillund reprimanded her for being rude when Twymon corrected a white co-worker's pronunciation of her name, but that when a white co-worker corrected Twymon when Twymon mispronounced a name, no such reproach was given.

Twymon also claims that Hall and Cerwick made discriminatory statements to her. Twymon alleges that, at some point – no exact date is given – Hall explained to

her that "intelligence and outspokenness in black employees is not welcomed" and that "qualities that would make a Caucasian a golden child, being aggressive and intelligent and outspoken and a go-getter, would do exactly the reverse to a person of color." Twymon alleges that Hall advised her to develop a deferential persona, as "a good black" that "would be accepted by the Caucasians at Wells Fargo," in addition to the person who she really was ("an intelligent, outspoken, professional black female"). Twymon alleges she responded by asking if she should "act[] like an Uncle Tom" and states that Hall replied in the affirmative. Twymon claims she reported this incident, either to people inside or outside of Wells Fargo, but she does not state when or to whom such a report was made.

Twymon alleges Cerwick said she was not "Midwest nice," a phrase she also attributes to Gillund. Twymon further alleges that Cerwick treated her differently than white employees. Twymon recounts an instance where she was reprimanded for making a decision contrary to the views of her Caucasian co-workers.

During her tenure at Wells Fargo, Twymon was subject to performance evaluations. In February 2001, Twymon received her first performance appraisal. Overall, Twymon was positively rated, but the appraisal noted areas in which Twymon fell short. Gillund commented on Twymon's errors on a recent project, her need to improve her ability to define process timeliness, and her need to improve on following projects through to completion. Twymon alleges that an earlier version of the appraisal included inappropriate references to her values and her personal behavior and that Gillund admitted she did not include such comments on white employees' evaluations. Gillund denies this accusation; the record does not include this alleged draft of the review. Gillund contends she continued to express concerns about Twymon's work throughout the year.

In September 2001, Twymon participated in a conference call that included Brad Blackwell, Vice President of Pacific Markets in California. During the

conference call, Blackwell discussed recruiting more minority home mortgage consultants in California. During this discussion, Blackwell admittedly made a statement to the effect, "We can't send white guys into east L.A. to sell mortgages to these people. You've got to send one of their own kind." Twymon viewed these comments as disparaging towards blacks and Hispanics. Twymon states she responded by informing Blackwell she was a member of the group he was discussing and that she was offended. Twymon felt Blackwell then reacted in a defensive and angry manner, so she left the conference call and returned with Hall, who she hoped would mediate the conflict. After the conference call, Hall investigated the incident. He determined that Blackwell did not behave inappropriately, while Twymon's behavior was inappropriate.

Twymon also complained to Gillund about the conference call. Twymon alleges that Gillund reprimanded her for her behavior on the Blackwell conference call and demanded Twymon apologize. Twymon further asserts that Gillund stated that part of Twymon's job included assisting white Wells Fargo employees in understanding black people.

Twymon's mid-year performance review commenced in October 2001. Gillund noted positive aspects of Twymon's performance in the review, but listed facets that needed improvement and characterized Twymon as "below expectations" in some areas. In particular, Gillund recounted that various human resources personnel had provided disconcerting feedback regarding Twymon's behavior, including her behavior during the Blackwell conference call. Gillund noted Twymon should work on defining deadlines and following through on projects. Twymon was specifically asked to ensure attendance and timeliness at meetings. And, the report instructed Twymon not to take work issues or discussions personally.

On November 6, 2001, Twymon, Gillund, and Cerwick met to discuss Twymon's performance. Gillund allegedly expressed continuing concerns about

Twymon's performance. Wells Fargo provided Twymon with the option of continuing her employment with a Performance Improvement Plan or separating from Wells Fargo under terms provided in a Departure Agreement. Twymon alleges that she asked Gillund if she was attempting to get rid of Twymon, and Gillund responded in the affirmative.

Twymon declined to resign and sign the Departure Agreement and instead entered into a Performance Improvement Plan. The Performance Improvement Plan was revised a number of times. Twymon alleges the revisions were made to make it more difficult for her to meet requirements; Gillund and Cerwick claim the changes were made at Twymon's request to clarify the document. The Performance Improvement Plan did not change Twymon's job responsibilities or reduce her compensation. The Plan made it clear that Twymon could be terminated if she failed to make satisfactory progress on the goals outlined in the Performance Improvement Plan.

Cerwick was informed of Twymon's alleged computer abuse while Twymon was working under the Performance Improvement Plan. Twymon was terminated for violating the computer policy on November 30, 2001. Following Tywmon's termination, a white male was hired to perform some of her duties, while the remainder of her job responsibilities were distributed to existing Wells Fargo employees.

Some months after her termination, Twymon contacted Hall and asked him to review her termination. Twymon told Hall she believed she was wrongfully terminated because she complained about racist behavior at Wells Fargo. Hall forwarded Twymon's request to George Innus, a member of Wells Fargo's Employee Relations Group. Innus investigated Twymon's termination and concluded that Twymon was not terminated on the basis of her race. He sent Twymon a letter

reiterating that her termination was based upon her excessive and inappropriate use of the Internet and e-mail, as explained to her at the time of her termination.

Twymon filed charges of discrimination with the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission. Both agencies notified Twymon of her right to sue, and Twymon filed suit alleging that her termination was a result of racial discrimination and retaliation in violation of federal and state law.

The district court granted Wells Fargo's motion for summary judgment. The district court reasoned that Twymon failed to establish either direct evidence of race discrimination or a prima facie case of racial discrimination, and, even if she had provided evidence supporting an inference of discrimination, Wells Fargo produced a legitimate, non-discriminatory reason for her termination that Twymon did not demonstrate to be pretextual. Likewise, the district court held that Twymon failed to establish a prima facie case of retaliation, and, even if she had, Twymon failed to show that Wells Fargo's proffered legitimate, non-discriminatory grounds for her termination were, in fact, a pretext.

II.    Standard of Review

We review de novo the district court's grant of summary judgment. Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1034 (8th Cir. 2006). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

-10-

III.    Discussion

    A.    Racial Discrimination

    Title VII of the Civil Rights Act of 1964 (Title VII) makes it an unlawful employment practice for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Iowa Civil Rights Act of 1965 likewise prohibits race-based employment discrimination. Iowa Code ch. 216.[4] A plaintiff may establish a violation of Title VII's prohibition against race-based termination through either direct or indirect evidence. See Price Waterhouse v. Hopkins, 490 U.S. 228, 270-79 (1989) (O'Connor, J., concurring). Twymon asserts she presented sufficient evidence of both kinds to avoid summary judgment. We disagree.

    1.    Direct Evidence

    Twymon first contends the district court erred in granting summary judgment on her employment discrimination claim primarily because statements made by Gillund and Hall constitute direct evidence of unlawful racial discrimination. We disagree. Direct evidence is evidence that establishes "a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003) (quotations omitted) (alteration in original). "'[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or

    [4]As the district court noted, federal interpretation of Title VII guides the application of the Iowa Civil Rights Act of 1965. Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 803 (Iowa 2003). Thus, our analysis regarding Twymon's Title VII claims addresses the claims brought under Iowa law, and a separate discussion is unnecessary.

-11-

'statements by decisionmakers unrelated to the decisional process itself.'" <u>Browning v. President Riverboat Casino-Missouri, Inc.</u>, 139 F.3d 631, 635 (8th Cir. 1998) (quoting <u>Price Waterhouse</u>, 490 U.S. at 277).

First, many of the statements Twymon attributes to Gillund and proffers as direct evidence of discrimination are, in fact, facially race-neutral. Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker. <u>See</u> <u>Putman</u>, 348 F.3d at 735 (noting that statements that plaintiff was not "humble enough" and was "too prideful" were facially race-neutral and were not direct evidence of discrimination). Twymon asks this court to extrapolate racial animus from statements such as "you don't know your place" and "Midwest nice," without providing any factual support or context for such speculation.[5] While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation. <u>See</u> <u>Hitt v. Harsco Corp.</u>, 356 F.3d 920, 923-24 (8th Cir. 2004).

Second, while both Gillund and Hall were involved in the decision to terminate Twymon, none of the statements Twymon attributes to them were related to the decisional process itself. Hall's alleged "Uncle Tom" statements, while racially offensive and misguided, were apparently made in the context of attempting to preserve and promote Twymon's career at Wells Fargo, not in relation to deciding to terminate Twymon. Similarly, none of the statements Twymon attributes to Gillund were made during the decisional process accompanying Wells Fargo's termination of Twymon. These remarks were stray comments, despite the fact that they were made by decisionmakers. <u>See</u> <u>Saulsberry v. St. Mary's Univ. of Minn.</u>, 318 F.3d 862, 867-68 (8th Cir. 2003) (noting that "an isolated, stray comment unrelated to the decisional process" is not direct evidence of discrimination, even if made by a decisionmaker).

---

[5]We note these phrases are materially different from the historically racially disparaging but facially-neutral term "boy" recently deemed potentially probative of racial animus in <u>Ash v. Tyson Foods, Inc.</u>, 126 S.Ct. 1195, 1197 (2006).

In addition to her claims about the comments by Gillund and Hall, Twymon raises additional arguments in support of her claim of direct evidence of discrimination. None of these arguments have merit and are therefore not addressed here. Thus, we agree with the district court's conclusion that Twymon failed to produce direct evidence of racial discrimination.

## 2. Indirect Evidence of Discrimination

In the alternative, Twymon contends the district court erred in granting summary judgment on her employment discrimination claim because she presented indirect evidence of unlawful racial discrimination. We disagree. We apply the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), to assess Twymon's claim based upon indirect evidence of discrimination. "Under this framework, a Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination." Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 656 (8th Cir. 2003). A plaintiff establishes a prima facie case by showing that: (1) she was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005). If a prima facie case is established, a "burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005). If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993).

We assume, without deciding, that Twymon established a prima facie case of discrimination. However, we agree with the district court that Wells Fargo articulated a legitimate, non-discriminatory rationale for Twymon's termination: gross violation

of the company's computer policy. We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee. See, e.g., Putman, 348 F.3d at 736. Wells Fargo offered evidence that Twymon violated its computer policy, which forbids excessive personal use of the Internet and e-mail, as well as the receipt, storage, or dissemination of obscene materials. "This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quotation omitted). The evidence proffered, including a log of websites accessed from Twymon's assigned IP address and images of nude and partially-nude males recovered from her computer hard drive,[6] establishes a legitimate, non-discriminatory reason for Twymon's termination.

Our consideration, then, is whether Twymon proved by a preponderance of the evidence that the stated reason for her termination was pretext. To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was her race. Johnson v. AT&T Corp., 422 F.3d 756, 763 (8th Cir. 2005). After a careful review of the record, we conclude that Twymon did not meet her burden.

Twymon failed to produce admissible evidence debunking the asserted rationale for her termination. Twymon attacks the stated reason for her firing with unsubstantiated speculation that someone else could have accessed her computer. She puts forth no evidence regarding this assertion and, in fact, acknowledges the protocols in place to identify individual computer users on the Wells Fargo system. Further, even if we were to consider Twymon's bare assertion that someone else could

---

[6]While the record is unclear as to when the objectionable images were found on Twymon's hard drive, the evidence that was unquestionably available at the time of her dismissal provided sufficient grounds for the conclusion that Twymon violated Wells Fargo's computer policy.

have accessed her computer, Twymon still would have to demonstrate that Wells Fargo terminated her improperly. A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination. See id. at 762 (explaining that the consideration in evaluating pretext is whether the employer honestly believed the employee violated the company's code of conduct, not whether the employer was factually correct in its conclusion). Twymon does not assert that Wells Fargo did not honestly believe she was accountable for violations of the computer policy when they fired her for those violations. Cf. Mershon v. St. Louis Univ., 422 F.3d 1069, 1074-75 (8th Cir. 2006) (explaining that, even assuming the underlying reason for the adverse action was false, the plaintiff failed in rebutting the proffered non-discriminatory reason because he presented no evidence from which to conclude the defendant knew or even suspected its falsity). As such, her assertion of possible access to her computer by other employees does nothing to support her claim of pretext.

Twymon also failed to offer evidence raising an inference that her termination was truly racially motivated. Contrasting the treatment of similarly situated employees outside of the protected class with the employee's treatment is one way to point towards a race-based motivation. See Putman, 348 F.3d at 736 ("A common way of proving pretext is to show that similarly situated employees were more favorably treated."). In this context, similarly situated employees would be those who also violated Wells Fargo's computer policy. Twymon failed to offer any admissible evidence regarding Wells Fargo's treatment of such employees. Further, none of the other evidence submitted in support of her claim of racial discrimination is sufficient to raise an inference of a discriminatory motive in her dismissal.

After a careful review of the record, we conclude that Twymon cannot demonstrate by a preponderance of the evidence that Wells Fargo's asserted non-discriminatory rationale for her termination is pretext. Accordingly, the district court's grant of summary judgment is affirmed.

B.    Retaliation

Title VII also makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Twymon claims she was the victim of discriminatory retaliation after she complained about comments she perceived to be racially derogatory made during the September 2001 conference call with Brad Blackwell. She contends the district court erred in granting summary judgment on her retaliation claim. We disagree.

When no direct evidence of discriminatory retaliation is asserted, as is the case at hand, the McDonnell Douglas analysis applies. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005). First, the plaintiff must put forth a prima facie case of retaliation. Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1078 (8th Cir. 2005). "To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action." Buettner v. Arch Coal Sales Co., 216 F.3d 707, 713-14 (8th Cir. 2000). Second, if the plaintiff puts forth a prima facie case, the employer may rebut the resulting presumption of discrimination by articulating a legitimate, non-retaliatory reason for the adverse employment action. Eliserio, 398 F.3d at 1078. Finally, if the employer proffers a race-neutral rationale, the plaintiff may attempt to refute the asserted reason as mere pretext. Id.

Our analysis of Twymon's retaliation claim mirrors that of our consideration of her racial discrimination claim. We assume, without deciding, that Twymon established a prima facie case of retaliation. Again we note that Wells Fargo produced a legitimate, non-discriminatory rationale for her termination. And we conclude, for the reasons articulated above, that Twymon failed to demonstrate the asserted

-16-

rationale was pretext for retaliation.  As such, we affirm the district court's grant of summary judgment as to Twymon's retaliation claim.

IV.    Conclusion

For the reasons stated herein, the judgment of the district court is affirmed.

_____