# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1088

_____

| | |
|---|---|
| Dr. Jean Montes, | * |
| | * |
| Plaintiff–Appellant, | * |
| | * |
| | *   Appeal from the United States |
| v. | *   District Court for the District |
| | *   of Minnesota. |
| Greater Twin Cities Youth | * |
| Symphonies (GTCYS), | * |
| | * |
| Defendant–Appellee. | * |

_____

Submitted: October 15, 2007
Filed: August 28, 2008

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Dr. Jean Montes appeals from the district court's[1] grant of summary judgment in favor of Greater Twin Cities Youth Symphonies, a non-profit music organization for youth, on his race- and national-origin-based employment-discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). We affirm.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

I.

We review the facts of this case "in the light most favorable" to Montes and "draw[] all reasonable inferences" in his favor "without resort to speculation." Twymon v. Wells Fargo & Co., 462 F.3d 925, 928 n.2 (8th Cir. 2006). Youth Symphonies is a non-profit organization in Minneapolis, Minnesota, that provides orchestral experiences for youth. The organization is governed by a board of directors that hires the Executive Director and the Artistic Director.

Montes was born in Haiti and lived there until he was "about 18" years old, when he immigrated to the United States. He held several positions as an orchestral conductor and administrator, and he received his Doctor of Musical Arts degree in May 2003. In July 2003, he began working as the Artistic Director at Youth Symphonies. Montes was an at-will employee. He was the only racial minority at the organization. Montes asserts numerous actions taken by Youth Symphonies indicate he was terminated based on his race or national origin.

Board members characterized Montes as African-American and suggested that he needed assistance assimilating. According to the deposition of Christine Corcoran, a former Executive Director of Youth Symphonies, board members talked about forming a transitional committee, and one board member, Cynthia Cargill, suggested the board form an African-American committee to help Montes "assimilate" into Minneapolis. Corcoran testified she responded by telling Cargill that Montes is Haitian, not African-American. In her deposition, Corcoran said she thought forming the committee would be inappropriate. Corcoran also testified board members discussed helping Montes with his speaking ability, as Montes had difficulties "speaking up [and] projecting." They also discussed helping him "get a better command of English," and a board member explained that some people "thought that they couldn't understand his accent." Montes testified Corcoran repeated Cargill's comments to Montes: that Montes "needed to be integrated into the community as an

African-American." Montes found this characterization to be discriminatory. Montes later indicated he was disappointed the board never formed a transition team to help him in the early months of his employment.

Montes also alleged that the board president's use of the phrase la bête noire evinced discrimination. He testified at his deposition that at an August 2003 meeting, the president of the board, Charlie Feuss, said he understood that Montes "was considered la bête noire of the organization." Montes understood this to be in reference to unpopular decisions Montes had recently made. Feuss, in his deposition, stated Montes had first used the phrase. Montes, in his deposition, stated he was not the first person at Youth Symphonies to use the phrase. Montes, in his brief, acknowledged that after Montes used the phrase in a meeting with Feuss, Feuss responded by asking Montes whether it means "the black beast." This is the French phrase's literal meaning, and it has been incorporated into the English language as a phrase that means "one that is particularly disliked or that is to be avoided." The American Heritage Dictionary of the English Language 174 (4th ed. 2006). Montes testified that "in [his] opinion," use of the phrase reflected "a discriminatory perception of [his] being."

Feuss used the phrase again during a September 2003 meeting with Montes. According to Montes, Feuss used the phrase "to describe [Montes's] situation" of starting to work at Youth Symphonies when it was having difficulties. According to Montes, Feuss later used the phrase to explain how Montes was being treated by a staff member. Additionally, Montes alleged the phrase "was used several times through [his] tenure," although he did not identify other specific instances.

Montes also alleged discrimination based on the board undermining his decisions. In support of this assertion, Montes explained the board asked him to restructure the orchestras in order to reduce costs. He made a recommendation to reassign two conductors, which the board approved. However, when others opposed this decision, board members failed to support Montes.

Montes explained he was treated differently from the new Executive Director of Youth Symphonies, Gwendolyn Freed, and from previous Artistic Directors. The organization gave Freed, but not Montes, a parking place close to the building. Additionally, Montes's actions were monitored more closely than Freed's. Montes also stated in his deposition he was not welcomed to Youth Symphonies or taken to lunch, unlike previous Artistic Directors.

Soon after Montes started, Youth Symphonies hired David Ranheim as interim Executive Director, which is not a position of authority over the Artistic Director. Ranheim belittled, demeaned, and intimidated Montes. Montes testified Ranheim told Montes that Montes did not have the persona to be an Artistic Director. Montes understood Ranheim meant this was because Montes was not European. Ranheim told Montes that Montes reminded Ranheim of his son. Ranheim called Montes a young African conductor. Ranheim also said Montes needed support and guidance from Ranheim. Montes alleged Ranheim referred to Montes's race in the fall of 2003, although Montes could not identify the statement. Montes alleged he discussed Ranheim's conduct with Feuss, but "nothing was done to stop . . . Ranheim's conduct."

Additionally, Montes alleges the board's reaction to his relationship with another music organization evinces discrimination. On May 11, 2004, Montes sent an e-mail to Youth Symphonies members informing them of an orchestra camp in Wayzata, Minnesota, Allegro Music Camp, where Montes was also an employee. The new Executive Director of Youth Symphonies, Freed, wrote in an e-mail to Montes that Allegro Music Camp "compete[d] directly" with Youth Symphonies. Montes, however, stated that the organizations did not compete and that before his involvement with Allegro, "it was tradition for [Youth Symphonies] personnel to participate in the Allegro camp." Montes noted that the Allegro director had indicated this to Montes and that a former Youth Symphonies employee participated in the camp before and after Montes's termination. Montes also testified that an Executive Director at Youth Symphonies had asked for Montes's assistance in recruiting students to a camp in the

Boston area. Montes said in his deposition that the board should not have been surprised he sent the e-mail, as board member and former president Lois Hesselroth was present when Montes discussed sending it.

When Freed replied to Montes's e-mail to express her dissatisfaction, she blind-copied board members. Feuss met with Freed to discuss her e-mail, and he later discussed this issue with Montes. The board's Executive Committee responded to Montes's relationship to Allegro by giving Montes a Counseling Report. Feuss and Jonathan Lewis, Executive Committee members, gave the Report to Montes at a meeting on May 25, 2004.

This Report noted that Montes's relationship with "Allegro Music Camp . . . raised several issues." Specifically, according to the Counseling Report, Montes accepted a position with the potential competitor without first seeking input or approval from the board. He promoted Allegro to Youth Symphonies students during a rehearsal and through an e-mail announcement. In the Counseling Report, the board also identified its expectations of Montes: Montes would consult with the board president before accepting outside jobs, he would not promote outside programs, he would treat Youth Symphonies' confidential information as such, and he would consult with the Executive Director before bringing non-Youth Symphonies members to rehearsals and before sending formal communications to Youth Symphonies students, parents, or donors. Montes alleged this altered the terms of his employment as identified in his offer letter, which provided he would "be permitted to engage in other musical or educational endeavors which do not interfere with [his] responsibilities at [Youth Symphonies]." The Counseling Report had a signature line where Montes was to sign to acknowledge receipt. Montes refused to sign it at that time.

According to an e-mail Lewis sent to the board's Executive Committee, Montes had said at the May 25th meeting it was unnecessary for him to seek any approval from the board president. Montes told the board he did not consider himself a Youth

Symphonies employee, but thought his position was equivalent to a director's position, and thus the board should not question his actions. In this e-mail, Lewis described Montes as "rude, condescending, arrogant and uncooperative." Lewis wrote to the board members that he thought they should meet again with Montes and if he would not agree to the Counseling Report, they would "talk about him moving on."

On July 1, Montes addressed members of the board. Montes testified that he talked about how excited he was about working for Youth Symphonies and thanked them for the opportunity to work there. He also told board members he would be willing to sign the Counseling Report if the entire board agreed he should. He thought this agreement was appropriate because, as explained above, he believed the Report amended his offer letter. Board members testified that Montes gave the board an ultimatum at the meeting, saying he would resign if the organizational structure of Youth Symphonies was not changed. Montes denies this. The following day, Feuss told Montes the board had voted to terminate Montes's employment, although he had the option to resign. According to a letter Feuss sent Montes, Montes was terminated because of his:

> continued unwillingness to cooperate with [Youth Symphonies'] Board and other staff members regarding the overall operations of the organization. This unwillingness to cooperate was most recently noted in [his] refusal to sign the counseling report presented to [him] on May 24, 2004 and in [his] statement to the Board on July 1, 2004 that [he] would resign [his] position rather than continue in the dual-leadership arrangement into which [he was] hired.

Barry Farrell, a member of the board who was at the meeting, disagreed with the board's decision to terminate Montes and resigned. Farrell wrote in his resignation letter that "certain perceptions about Dr. Montes have been based on incomplete information, inaccurate details, biases, and misunderstandings." Farrell also testified he thought the board's vote was "staged," as board members had already

-6-

decided to terminate Montes's employment before they voted on it at the meeting. Youth Symphonies later hired Marlene Pauley, who is Caucasian, as Artistic Director.

Montes had known since that June that Virginia Commonwealth University was interested in making him an offer for employment at a higher salary, and he began working at the university after the board terminated his Youth Symphonies employment.

Montes filed a complaint alleging racial discrimination with the Equal Employment Opportunity Commission, which issued a right to sue letter. Montes filed suit in district court alleging the board terminated his employment and he was subjected to a continuous pattern of harassment and a hostile work environment because of his race, color, and national origin, in violation of 42 U.S.C. § 2000e-2(a)(1).

Youth Symphonies filed a motion for summary judgment, which the district court granted. In granting the motion, the district court first determined Montes did not offer direct evidence of discrimination. Cargill's suggestion that the board form an African-American committee to assist Montes's transition to the community was not direct evidence because the committee "was intended to enhance, rather than harm Montes' experience with [Youth Symphonies]." Additionally, according to the district court, "[n]othing in the context of . . . Cargill's suggestion could support a finding by a reasonable jury that her comment was not made for [a] well-intentioned purpose." The district court found Cargill's comment was also not direct evidence because it was made in the context of hiring Montes, not firing him.

The district court additionally determined use of the phrase <u>la bête noire</u> was not direct evidence of discrimination because the phrase "has been incorporated into the English language with a race-neutral meaning and carries no discriminatory connotation." The district court considered "the context in which Feuss used the

phrase," and determined that "the only reasonable conclusion is that the phrase was used in the conventional English-language way."

The district court held that, under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973), Montes "failed to discredit [the Youth Symphonies'] stated reasons for termination," noting it is undisputed Montes and the board had a conflict over Montes's obligations to report to the board and Montes was ultimately terminated for failing to notify the board before promoting Allegro, a potentially competing music camp.

Montes appeals only the grant of summary judgment on his unlawful termination claim, not his hostile work environment claim.

II.

"We review the district court's grant of summary judgment de novo." Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000). Summary judgment "is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." Id. (citation omitted).

Title VII of the Civil Rights Act of 1964 prohibits Youth Symphonies from "discharg[ing] any individual . . . because of such individual's race, color . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Montes does not assert he has direct evidence of discrimination, see Price Waterhouse v. Hopkins, 490 U.S. 228, 270–79 (1989) (O'Connor, J., concurring), we apply the framework from McDonnell Douglas Corp., 411 U.S. at 802–03. Twymon, 462 F.3d at 933–34; see also Gebresadik v. Gonzales, 491 F.3d 846, 851 n.6 (8th Cir. 2007) (finding that arguments not briefed are waived).

## A.

The McDonnell Douglas framework requires Montes to first establish a prima facie case of discrimination. See McDonnell Douglas Corp., 411 U.S. at 802. Here, we assume without deciding Montes has established a prima facie case. See Twymon, 462 F.3d at 935 (assuming without deciding that a the plaintiff established a prima facie case). We assume Montes is a member of a protected class, he was meeting legitimate job expectations, termination of his employment was an adverse employment action, and he was replaced by a person outside the protected class. See Johnson v. Baptist Med. Ctr., 97 F.3d 1070, 1072 (8th Cir. 1996).

## B.

Under the second step of McDonnell Douglas, Youth Symphonies must "articulate [a] legitimate, nondiscriminatory reason" for Montes's discharge. Id. at 802. The organization terminated Montes because he was unwilling to cooperate with board and staff members. The organization thus met its non-onerous burden. See Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005) (providing that the employer's burden is "not onerous").

## C.

"[T]he ultimate burden falls on [Montes] to produce evidence sufficient to create a genuine issue of material fact regarding whether [Youth Symphonies'] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." Id. "[T]he burden-shifting framework is merely an analytical construct; the ultimate burden of proving [discrimination] remains at all times with [Montes]." Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993) (finding that the plaintiff "retains that ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination" (internal quotation and brackets omitted)).

i.

Montes failed to establish that Youth Symphonies' legitimate reasons for firing him were pretextual. He claims other directors promoted and participated in other music camps and that, before his termination, other directors promoted and participated in Allegro. Montes does not allege, however, that they did so without prior approval from the board. It is undisputed Montes disagreed with the board regarding many aspects of governing the organization. Montes himself indicated in his deposition he had been unwilling to cooperate with the board. He testified that he has expertise and that board members do not. He testified he should have had the ability to decide what was best for Youth Symphonies and what actions constituted a conflict of interest. Youth Symphonies terminated Montes's employment because of this attitude, which is a legitimate, nondiscriminatory reason. See Larry v. Potter, 424 F.3d 849, 851 (8th Cir. 2005) (explaining that "an employee's negative work attitude" is a legitimate, nondiscriminatory reason); see also Clay v. Hyatt Regency Hotel, 724 F.2d 721, 724 (8th Cir. 1984) (finding an applicant's "dominant and headstrong" personality and exhibition of a "'know-it-all' attitude" was a legitimate, nondiscriminatory reason for not hiring him). Regardless of whether Montes, an employee of the board, was unwilling to accept the board's authority, the board members' perception that he was unwilling is a legitimate, nondiscriminatory reason for Montes's termination. See Johnson v. AT&T Corp., 422 F.3d 756, 762 (8th Cir. 2005) (noting that "the proper inquiry *is not* whether [the employer] was factually correct in determining" whether the employee had engaged in impermissible conduct, but rather "the proper inquiry is whether [the employer] honestly believed" so). As a result, we find that Montes has failed to create a question of fact regarding Youth Symphonies' legitimate, nondiscriminatory reason.

ii.

Further, Montes failed to satisfy his "ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination." Hicks, 509 U.S. at 508

(internal quotation and brackets omitted). The evidence does not enable a reasonable jury to conclude the board, which had recently hired Montes, campaigned to have Montes's employment terminated because of his race or national origin. Feuss, the president of the board, commented that Montes was referred to as la bête noire on at least three occasions. Feuss did not call Montes la bête noire, but stated that others were using the phrase to refer to Montes. Montes does not provide evidence that, after using the phrase himself, he told Feuss it was offensive and evinced racial discrimination. We thus find the use of the phrase, which refers to one who is to be avoided, does not create a trialworthy issue of discrimination in this case.

Our conclusion is not affected by Montes's argument that the board presented him with the Counseling Report allegedly without justification. Even assuming the board was unjustified in presenting Montes with the Report, there was still insufficient evidence to enable a jury to conclude Montes established his "ultimate burden," that he was fired because of his race or national origin.

Farrell decided to resign from the board after it terminated Montes's employment, asserting board members were biased against Montes. When questioned, however, Farrell was unable to identify the basis for this conclusion or any evidence indicating the board's decision was based on Montes's race or national origin. Such conclusory assertions by a single board member do not provide a basis on which a reasonable jury could find illegal discrimination.

Board members' suggestions of forming an African-American committee to help Montes assimilate into the Minneapolis community and a subcommittee to address Montes's soft spokenness and accent also did not evince discrimination. At most, this evidence suggested board members were aware of Montes's ethnicity and the issues that could arise within the Minneapolis community and Youth Symphonies, an all-Caucasian organization, as a result. No reasonable jury could conclude this evidence indicated the board terminated Montes's employment because of his race or national origin.

-11-

Montes alleges discrimination based on the actions of Executive Director Ranheim and on the board's failure to intervene. We express no opinion on whether Ranheim's actions constituted a hostile work environment, as this issue is not before us. Montes only appealed his claim that he was subject to discrimination based on his firing. Because Ranheim was not a member of the board at that time and not a decision maker in the termination of Montes's employment, Montes is "required to demonstrate some causal relationship between [Ranheim's] statements and [the board's] decision to terminate [Montes's] employment." Johnson, 422 F.3d at 763. Montes failed to demonstrate this. Montes also failed to demonstrate a causal relationship between the board's failure to intervene and his termination. Thus, we do not consider Ranheim's actions in determining whether the board terminated Montes because of his race or national origin.

While use of the phrase la bête noire gives us pause, we conclude that the evidence taken as a whole is "insufficient to permit a reasonable jury, without resort to speculation, to draw [an] inference" that the board terminated Montes's employment because of his race or national origin. See Stewart, 481 F.3d at 1045–46. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (cited in Stewart, 481 F.3d at 1046). Given the board's legitimate reasons for terminating Montes's employment and the lack of evidence that the board's conduct was based on Montes's race or national origin, we conclude that the district court did not err in granting Youth Symphonies' motion for summary judgment.

We affirm the district court's granting of Youth Symphonies' motion for summary judgment.

_____

-12-