

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| MARNIE L. SIMMONS, | ) | No. 73849-6-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICROSOFT CORPORATION, a | ) | |
| Washington Corporation, | ) | |
| | ) | |
| Respondent. | ) | FILED: July 5, 2016 |

SCHINDLER, J. — Marnie L. Simmons appeals summary judgment dismissal of her lawsuit against Microsoft Corporation alleging age and race discrimination in violation of the Washington Law Against Discrimination, chapter 49.60 RCW. We affirm.

FACTS

Marnie L. Simmons was born in October 1969. Her father is of Norwegian and German descent. Her mother is Hawaiian. Simmons identifies as a Pacific Islander.

In 2006, Microsoft Corporation (Microsoft) hired Simmons as a Business Administrative Assistant. In October 2008, Simmons started working as the Executive Business Administrator to Microsoft Corporate Vice President Rosanna Ho. Ho gave Simmons generally positive performance evaluations but noted concerns about her

interpersonal skills. For example, in the 2009 mid-year evaluation, Ho states, "[Y]ou have a bright future ahead of you here at Microsoft," but suggests Simmons "work on" her "interpersonal and communication skills" so they do not "become obstacles in your career." Ho states, "You sometimes become angry quickly," and notes this is "not acceptable at the [Executive Business Administrator] levels." In the 2009 annual performance review, Ho encouraged Simmons to "[i]mprove tone in verbal and written communications and ensure clarity in your communications when working with others."

In 2011, Simmons applied to work as the Executive Business Administrator to Bret Arsenault. Arsenault was the Chief Information Security Officer and head of the Information Security Risk Management (ISRM) team. Arsenault was "responsible for enterprise-wide information security, compliance, and business continuity efforts" and oversaw "hundreds of employees."

Simmons interviewed with members of the ISRM team. The ISRM team members recommended Simmons for hire but raised some concerns about her "interpersonal skills." When Arsenault interviewed Simmons, he also "had some concerns based on the feedback from other interviewers, but . . . felt she was a good candidate for the job." Arsenault's first choice to fill the position was a temporary employee who had worked as his Interim Executive Business Administrator for about one year. When that employee did not accept the position, Arsenault offered Simmons the job as his Executive Business Administrator.

Simmons started working for Arsenault in May 2011. Simmons was responsible for managing Arsenault's calendar, scheduling meetings, ensuring meeting agendas were accurate, and coordinating travel arrangements. Simmons' work "affect[ed] the

productivity of the group overall." For example, if Simmons scheduled a meeting at a time when other members of the ISRM team were unavailable, "50 other people [would] have to reschedule."

For the 2011 annual performance review, Arsenault relied "largely on [Simmons'] performance in her previous position" and only to a limited extent on her time as his Executive Business Administrator. Arsenault rated Simmons as a "2." The rating scale is 1 to 5; 1 is the highest rating and 5 is the lowest. Arsenault states Simmons is a "great hire" with a "bright future" but notes her "very direct approach" could "land[ ] . . . negative[ly]" with other members of the team, and suggests she "spend time on . . . interpersonal awareness."

In September 2011, Arsenault hired Ken Sexsmith as the ISRM team Business Manager. Sexsmith was responsible for scheduling and setting the agenda for ISRM team meetings. When selecting meeting dates, Sexsmith had to coordinate with Simmons. Sexsmith also was responsible for arranging Arsenault's "speaking engagements." After Sexsmith determined potential speaking engagement dates, he would "go back and forth" with Simmons to determine what days Arsenault was available. Simmons and Sexsmith had a "strained" relationship and "there was often confusion as to how [their] job responsibilities overlapped."

In late 2011, Arsenault hired Brian Fielder as the ISRM team Principal Information Technology Service Engineer Manager. Arsenault worked with Fielder in the past and considered him a personal friend. Arsenault referred to Fielder as "the real kahuna." Fielder is Pacific Islander.

In January 2012, Arsenault sent Simmons and Sexsmith an e-mail about the need to improve their working relationship and to work collaboratively and effectively.

> I have had time to review both of your feedback on [the] working relationship you have in ISRM. As I pointed out in those sessions and previously the working relationship between the leader, [Executive Business Administrator,] and [Business Manager] is cornerstone to an overall strong leadership team. You both have some work to do to improve your working relationship and it is my expectation that you will focus on this area to ensure you can collaborate and partner effectively. I am happy to meet with you and provide coaching.

Arsenault asked Simmons and Sexsmith to draft three requests and three commitments to improve their relationship.

Arsenault was "disappointed" by Simmons' response. Arsenault felt Simmons merely stated she would "continue to do what she did since October but is open to feedback." Arsenault contacted the Human Resources Department to "figure out how to help [Simmons and Sexsmith] both be more engaged."

In January 2012, Arsenault met with Simmons to discuss "concerns about her interactions with others on the team." Arsenault advised Simmons that she "needed to show immediate and sustained improvement to succeed in her role." Following the meeting, Arsenault said Simmons' interactions with others improved.

In the 2012 mid-year evaluation, Arsenault states Simmons is "very helpful" in certain areas and "very passionate about the work." But Arsenault notes Simmons has a "very direct approach," she has "a negative impact on productivity and perception," and her improvement since January in how she interacts with others needs to be "sustained." In June, Arsenault "again asked Human Resources for guidance on how to address Ms. Simmons' performance issues and help her meet basic performance expectations."

In August, Arsenault met with Simmons to "discuss her performance, including how critical it was that she be able to work cooperatively with Mr. Sexsmith." In a follow-up e-mail to Simmons, Arsenault states that despite months of effort, she was "not meeting expectations" in working with Sexsmith, resulting in a significant negative "impact on our business" and the ISRM team. The e-mail from Arsenault to Simmons states, in pertinent part:

> As I mentioned in our previous 1:1 and again in this month[']s, I am concerned about the importance of being able to partner with the Business [M]anager role as it is critical to the success of the organization. This core requirement for your role was something we made clear upon your arrival and you are not meeting expectations. This was so key we ensured you were integral to the hiring of the new Business Manager. Unfortunately this partnership is still not meeting expectations despite months of my effort to reconcile via coaching, joint meetings etc. This is having a significant impact on our business and affecting individuals beyond you and the Business manager, not to mention the clear impact on both of you directly.

Simmons responded, "I do not have a partnering problem with anyone else in the [organization]." Simmons asserted it is "incredibly difficult that you continuously lay 100% blame on [Sexsmith's] inability to partner on me."

In response, Arsenault sent an e-mail to Simmons clarifying that he "never blamed this 100% on you," that her "partnering assertions are not shared by all in [ISRM]," and that she should "seek to understand why rather than be defensive."

> To be clear [M]arnie I am just following up on our 1 on 1. . . . I have never blamed this 100% on you and have specifically corrected you on that perspective before and remind you again that is not now nor has never been my assertion. Ken has a part to play and as his manager I deal directly with him on that. However, this is feedback to you re my expectations of your role. On options, we have tried various iterations with little improvement as you acknowledged in the last two 1 on 1's. [T]he last feedback I asked for took over a month to get a response and only with continual reminders. I want to be sure you understand that your partnering assertions are not shared by all in [ISRM] or with our partners.

It would behoove you to seek to understand why rather than be defensive as there could be key learning's [sic] to help drive interpersonal awareness.

In the September 2012 annual performance review, Arsenault gave Simmons the lowest rating. Arsenault notes Simmons "continues to be a very hard worker" who "takes pride in her strong work ethic." However, "results in FY12[1] . . . were below expectations" and there were "significant challenges with cross team collaboration and difficult communications. . . . Marnie has struggled with treating people equitably and with appropriate respect."

> Marnie's results in FY12 against commitments, how the work was accomplished, and overall impact to the business were below expectations. This was a very tough year and we had inconsistencies with Calendar management and travel logistics (particularly international travel). Additionally we had significant challenges with cross team collaboration and difficult communications. While Marnie has the best interest of the group in mind "how" that gets communicated in difficult situations is having a negative impact on our business, several of our partners and the team. Feedback during the review process and my own experience demonstrate that Marnie has struggled with treating people equitably and with appropriate respect. This is not isolated but was particularly acute with her relationship with our Business Mangers and Recruiting Partner. Several escalations were raised and numerous attempts to resolve the issues failed to yield acceptable results.

Arsenault also noted Simmons was "on occasion demeaning to others," "quick to point out what was wrong in others [sic] people work," and needed to "demonstrate significant improvement in [her] performance for [her] to meet expectations and be successful in [her] role and at Microsoft."

> Lastly I was concerned how Marnie would shut down and shut others out. She was on occasion demeaning to others and would isolate others form [sic] decision making and information. There were several complaints about people being removed from message threads and then not updated on the final outcome. In addition she was quick to point out what was wrong in others [sic] people work without engaging in "how" to fix it. This

---

[1] Fiscal year 2012.

behavior drained the energy and inadvertently created a fear of directly engaging with Marnie on sensitive issues. . . . You need to demonstrate significant improvements in your performance for you to meet expectations and be successful in your role and at Microsoft.

Arsenault asked Simmons to prepare a "performance plan" and "suggested she take a training class on interpersonal awareness." Simmons "disagreed" with Arsenault's assessment of her performance and refused to sign her review.

In early January 2013, Arsenault sent Simmons an e-mail identifying a number of areas where he had "not seen the attention or demonstrated improvements" and areas "to focus on for improvement." These issues included "Communications: Follow up and Prioritization;" "Collaboration / treating others with Respect;" and "The Planning, Organizing and Coordinating components of the role." Arsenault noted an "ongoing pattern of behavior from FY12" that "continues into FY13" and that Simmons was "not meeting expectations."

> The above [set of concerns] has been an ongoing pattern of behavior from FY12 and continues into FY13. I was explicit during your performance review on FY13 expectations for your role. This continuing behavior of lack of initiative to increase your capability expected in your role deprives you of the ability to course correct when you are receiving feedback not only from me but others that may also provide it to you. I expect you to be able to take, understand and incorporate feedback continuously to demonstrate improvement and meet expectations for your role. . . . You are not meeting expectations for your role.

Arsenault continued to work with the Human Resources Department regarding his concerns and asked for assistance to help Simmons improve. Meanwhile, other team members expressed "concerns" about Simmons to Arsenault and the Human Resources Department.

By late January, Simmons still had not provided the performance plan Arsenault requested after her September 2012 performance review. On January 21, Arsenault

sent Simmons an e-mail about the failure to deliver the performance plan. Arsenault states he has "not seen any improvement" and Simmons continues "not to meet expectations" for her role.

> You have failed to deliver your performance plan after **4** months. . . . This is another miss on delivering your plan but more importantly an example of where you are not taking the feedback and working on the agreed upon deliverable. . . . Marnie I have not seen any improvement relative to the feedback in your annual review nor any concerted effort to address the concerns raised despite resources being offered from various [Human Resources] personnel and [leadership team] members.

> I have been explicit regarding expectations for your role and deliverables. You continue not to meet expectations for your role.

On February 11, 2013, Arsenault and a Human Resources Department representative met with Simmons and terminated her employment. The termination letter states, "Your employment is being terminated because your job performance and competency levels have not met minimum performance standards and expectations for your position."

In March 2013, Sara Young began working as Interim Executive Business Administrator to Arsenault. ISRM team member Chris Hildenbrand had hired Young in approximately January 2012 to work as his Business Administrator. Young applied to fill the Executive Business Administrator position permanently. Arsenault interviewed four candidates for the position. Arsenault hired Young for the position. Young was 32 years old at the time.

On September 8, 2014, Simmons filed a lawsuit against Microsoft alleging age and race discrimination in violation of the Washington Law Against Discrimination, chapter 49.60 RCW.

Microsoft filed a motion for summary judgment dismissal of the lawsuit. Microsoft argued there were legitimate nondiscriminatory reasons to terminate Simmons based on "significant performance issues." Specifically, lack of "interpersonal, communication and collaboration skills" and ongoing conflicts with Business Manager Sexsmith and others. Microsoft argued there was "nothing to suggest . . . pretext for unlawful discrimination" based on Simmons' age or race.

In support, Microsoft submitted deposition excerpts; copies of the 2009 mid-year evaluation and annual performance review, the 2010 mid-year evaluation, the 2011 annual performance review, and the 2012 mid-year evaluation and annual performance summary; copies of numerous e-mails between Arsenault and Simmons; copies of e-mails between Arsenault and the Human Resources Department; and declarations from several people including Ho, Young, and Arsenault.

Ho states that "[d]uring the time I managed Ms. Simmons, I had several conversations with her about her communication style." Ho states Simmons "also had conflicts with one of my business managers."

Young states she began working at Microsoft in 2009 and from January 2012 to May 2013, "on an as-needed basis, supported Mr. Arsenault's entire organization."

> From approximately January 2012 to May 2013, I reported to one of Mr. Arsenault's direct reports, Chris Hildenbrand. In that role I supported three of Arsenault's direct reports, including Mr. Hildenbrand; acted as Mr. Arsenault's [Executive Business Administrator] when Ms. Simmons was out of the office; and, on an as-needed basis, supported Mr. Arsenault's entire organization, including his Business Manager, Ken Sexsmith.

In February 2013, Young "started managing Mr. Arsenault's calendar while still working full time for Mr. Hildenbrand and supporting the rest of Mr. Arsenault's organization." In

March 2013, Young began working as Interim Executive Business Administrator to Arsenault.

Arsenault describes the "issues and conflicts" while Simmons worked as his Executive Business Administrator and the steps he took to address the issues. Arsenault states he "had to spend inordinate amounts of time debating with Ms. Simmons about her performance issues and seeking to resolve conflicts between her and others." But Arsenault "did not see . . . improvement" in her performance and there was "no indication she would sufficiently improve in the near future." Arsenault states, "Ms. Simmons' ongoing performance issues, coupled with the demands of the business, drove the need for change." Arsenault also states, "When Ms. Simmons worked at Microsoft I did not know her age or if she was under or over age 40. Nor did I know her father was Caucasian or that she identifies as Pacific Islander."

In opposition, Simmons argued the decision to terminate was based on her age and race. Simmons noted the positive performance reviews she received as well as a "Kudos" award and a "Team Award."[2] Simmons argued Microsoft gave "inconsistent and ambiguous" reasons for her termination and her 2012 performance review was "entirely inconsistent" with her previous performance evaluations. Simmons asserted replacing her with a "much younger, less-experienced employee" was evidence of age discrimination, and Arsenault's use of the phrase "real kahuna" was evidence of race discrimination.

Simmons submitted a declaration, her deposition testimony, performance reviews from 2007 until 2012, and a copy of the January 2013 "Microsoft 360 Feedback"

---

[2] The record shows the Kudos award was merely a "Thank you" e-mail from a colleague. The Team Award was unrelated to Simmons' job duties and given to 11 other employees, including Young, for volunteering to help put on a company potluck.

report. In her deposition, Simmons states that near the time Arsenault hired Brian Fielder, Arsenault told her, "I'm bringing in the real kahuna." Simmons testified she interpreted the statement to mean that she was a "halfbreed" and "not the real deal, not the real Hawaiian." In her declaration, Simmons states the comment "was offensive to me because it implied that I was not a real Hawaiian/Pacific Islander."

The 2007 and 2008 performance reviews from her former supervisor, Walter Korn, are generally positive. The performance reviews from Ho are also generally positive but Ho notes concerns about interpersonal and communication skills. In the Microsoft 360 Feedback report, Arsenault and 12 of Simmons' other colleagues rated her in a number of categories including "Interpersonal Awareness" and "Communication Skills." Simmons' colleagues gave her higher scores than Arsenault. The combined scores show that Simmons received low ratings for Interpersonal Skills and Communication Skills.

Microsoft argued the undisputed record showed the reasons for terminating Simmons were "always focused on aspects of Ms. Simmons' performance and its impact on the business, particularly her communication style and difficulty working with others." Microsoft argued Simmons did not raise a reasonable inference of age or race discrimination. Microsoft asserted the fact that Arsenault hired Young to replace Simmons did not indicate age was a substantial factor in the termination decision, and Arsenault's use of the phrase "real kahuna" did not raise a reasonable inference of racial discrimination.

The court granted the motion for summary judgment and dismissed the lawsuit. Simmons appeals.

11

ANALYSIS

Simmons contends the court erred in dismissing her discrimination lawsuit against Microsoft. Simmons asserts there are genuine issues of material fact as to whether either age or race was a substantial factor in the decision to terminate her employment.[3]

Standard of Review

We review an order of summary judgment dismissal de novo, engaging in the same inquiry as the trial court. Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014). We consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). Speculation and "mere allegations, denials, opinions, or conclusory statements" do not create a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (citing CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988)).

Under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, it is an unfair practice for an employer to discharge any person from employment on the basis of age or race. RCW 49.60.180(2).

---

[3] Simmons also seeks review of an order denying her CR 56(f) motion to continue but fails to assign error to the order or present any argument addressing the order in her briefing. Failure to assign error or provide argument precludes appellate consideration. RAP 10.3(a)(4), (6); Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845-46, 347 P.3d 487 (2015).

Where there is no direct evidence of discrimination, we use the McDonnell Douglas/Burdine burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981);[4] Scrivener, 181 Wn.2d at 445; Davis v. Microsoft Corp., 149 Wn.2d 521, 546, 70 P.3d 126 (2003). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. Burdine, 450 U.S. at 252-53; Scrivener, 181 Wn.2d at 446. The burden of production then shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. Burdine, 450 U.S. at 253; Scrivener, 181 Wn.2d at 446. The burden of the employer is not one of persuasion, but rather a burden of production. Grimwood, 110 Wn.2d at 364. If the employer articulates a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to produce evidence that the legitimate nondiscriminatory reason for the employment action is a pretext for a discriminatory purpose. Scrivener, 181 Wn.2d at 446.

For the first time on appeal, Simmons claims Microsoft did not present evidence showing that Microsoft terminated her for a legitimate nondiscriminatory reason. "Under RAP 9.12, arguments not brought to the attention of the trial court at the time of summary judgment may not be considered by the appellate court." Houk v. Best Dev. & Const. Co., Inc., 179 Wn. App. 908, 915, 322 P.3d 29 (2014); Nelson v. McGoldrick, 127 Wn.2d 124, 140, 896 P.2d 1258 (1995). In any event, the record establishes Microsoft articulated legitimate nondiscriminatory reasons to terminate Simmons.

---

[4] Because the WLAD substantially parallels Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e-2(a), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. section 623(a), we may look to federal case law for guidance. Kumar v. Gate Gourmet, Inc., 180 Wn.2d 481, 490-91, 325 P.3d 193 (2014); Grimwood, 110 Wn.2d at 361.

Specifically, that Simmons lacked "interpersonal, communication and collaboration skills and had ongoing conflicts with the group's Business Manager (Mr. Sexsmith) and others."

The plaintiff may meet the pretext prong by offering sufficient evidence to create a genuine issue of material fact (1) that the employer's reason is pretextual or (2) that although the employer's stated reason is legitimate, "discrimination nevertheless was a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 446-47. "A 'substantial factor' means that the protected characteristic was a significant motivating factor bringing about the employer's decision." Scrivener, 181 Wn.2d at 444.

Inconsistent reasons for a defendant's employment decisions may support an inference that the employer's articulated reason is a pretext for discrimination. See Rice v. Offshore Sys., Inc., 167 Wn. App. 77, 91, 272 P.3d 865 (2012); Sellsted v. Wash. Mut. Sav. Bank, 69 Wn. App. 852, 863, 851 P.2d 716 (1993). Simmons asserts Microsoft provided "inconsistent" reasons for her termination. Simmons points to the portions of Arsenault's declaration where he states he "met with Ms. Simmons to discuss my concerns about her interactions with others on the team" and "again addressed her performance issues." Neither of Arsenault's statements is inconsistent with the articulated reason for terminating Simmons' employment and do not raise a reasonable inference that Microsoft's articulated reason is a pretext for race or age discrimination. Microsoft consistently stated it terminated Simmons because of her performance issues related to lack of interpersonal, communication, and collaboration skills as well as her ongoing conflict with Sexsmith.

Simmons also asserts her "overwhelmingly positive" performance reviews create a reasonable inference that Microsoft's articulated reason for terminating her employment is a pretext for race and age discrimination.

The fact that Simmons received generally positive performance reviews from previous supervisors does not lead to a reasonable inference that Microsoft's articulated reason for terminating her employment was a pretext for discrimination based on age or race. McCann v. Tillman, 526 F.3d 1370, 1377 (11th Cir. 2008) (Previous supervisor's "satisfactory ratings" and commendation from colleagues did not raise reasonable inference of pretext because " '[d]ifferent supervisors may impose different standards of behavior.' ") (quoting Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002)). An employee's "subjective beliefs and assessments as to h[er] performance are irrelevant" to show pretext. Griffith v. Schnitzer Steel Indus., Inc., 128 Wn. App. 438, 447, 115 P.3d 1065 (2005).[5]

Simmons argues she produced sufficient evidence of age discrimination. Without citation to authority, Simmons asserts that "replacement by a younger employee creates a presumption of discriminatory intent." But replacing Simmons with a younger individual in and of itself does not raise a reasonable inference that Simmons' age was a significant motivating factor in Arsenault's decision to terminate her. See Thomas v. Corwin, 483 F.3d 516, 529 (8th Cir. 2007) (finding that plaintiff could not show the employer's reasons for her termination were a pretext for age discrimination

---

[5] Simmons also asserts Arsenault "judged" her performance "differently" than that of younger or non-Pacific Islander employees. Nothing in the record indicates how Arsenault evaluated the performance of other employees. This conclusory allegation does not raise a material issue of fact as to Simmons' age discrimination claim. Int'l Ultimate, 122 Wn. App. at 744; Grimwood, 110 Wn.2d 365.

where the plaintiff's only evidence was that she was replaced by someone younger).[6]

For the first time on appeal, Simmons claims Arsenault treated her "differently than similarly situated young employees" and was "biased against Ms. Simmons." We decline to address arguments not brought to the attention of the trial court at the time of summary judgment. RAP 9.12; Houk, 179 Wn. App. at 915; Nelson, 127 Wn.2d at 140. Moreover, these conclusory allegations and opinions do not amount to material facts admissible in evidence showing there is a genuine issue for trial as to Simmons' age discrimination claim. Int'l Ultimate, 122 Wn. App. at 744; Grimwood, 110 Wn.2d 365.

Scrivener and Rice are distinguishable. In Scrivener, in addition to hiring a younger candidate, the college president made remarks indicating a preference to hire younger people and hired many individuals under 40 but few over 40. Scrivener, 181 Wn.2d at 442-43. In Rice, in addition to replacing the plaintiff with a much younger employee, the employer offered inconsistent reasons for termination, and the plaintiff's supervisor "routinely made age-related comments." Rice, 167 Wn. App. at 90-91.

The only evidence Simmons relies on to argue her race was a significant factor in the decision to terminate her employment is her recollection that near the time Arsenault hired Brian Fielder, Arsenault told her he was "bringing in the real kahuna."[7] The record shows Simmons did not mention the remark to Arsenault or ask what he meant. Simmons testified the meaning of "kahuna" "can range from a lot of different things," but she construed the comment to mean she was a "halfbreed" Pacific Islander

---

[6] See also Griffith, 128 Wn. App. at 456 (evidence "insufficient as a matter of law" to support age discrimination claim where "only evidence" presented was that plaintiff's "replacement was younger than he was"); Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 517 (8th Cir. 2011) (hiring of employees younger than plaintiff "standing alone, does not create an inference" that the employer discriminated against plaintiff on the basis of her age).

[7] In her reply brief, Simmons claims Arsenault called her a "real kahuna." But Simmons' deposition testimony clearly states that Arsenault was referring to Brian Fielder.

16

and thus not the "real kahuna."[8] Simmons asserts this "disconcerting comment" raises a reasonable inference that Arsenault's decision to terminate her was motivated by racial animus. We disagree.

Even viewed in the light most favorable to Simmons, Arsenault's statement does not indicate any animus toward individuals of Pacific Islander heritage or raise a reasonable inference that Simmons' race was a significant motivating factor in Arsenault's decision to terminate her. The record does not show the decision to terminate Simmons was related to Arsenault's comment. Arsenault made the comment more than one year before terminating Simmons. The undisputed evidence shows Arsenault had worked with Fielder before and considered him a personal friend. Simmons' argument is based purely on her subjective opinion of the meaning of Arsenault's statement and does not lead to a reasonable inference of racial discrimination. See Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 74-75 (2d Cir. 2015) ("even if sincerely held, a plaintiff's 'feelings and perceptions of being discriminated against' do not provide a basis on which a reasonable jury can ground a verdict") (quoting Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir.1999)); Montes v. Greater Twin Cities Youth Symphonies, 540 F.3d 852, 854, 858-59 (8th Cir. 2008)[9] (reference to Haitian employee on at least three occasions as "la bête noire"[10] did not raise reasonable inference that employer's legitimate reasons for termination were

---

[8] Webster's Third New International Dictionary 1230 (2002) defines "kahuna" as a Hawaiian word meaning "native master of a craft or vocation."

[9] Alterations in original.

[10] In French, "la bête noire" translates literally to " 'the black beast.' " Montes, 540 F.3d at 854. The English language has incorporated the phrase as meaning " 'one that is particularly disliked or that is to be avoided.' " Montes, 540 F.3d at 854 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 174 (4th ed. 2006)).

pretext for racial discrimination even where employee testified that " 'in [his] opinion,' use of the phrase reflected 'a discriminatory perception of [his] being' ").[11]

Simmons also claims Arsenault treated "similarly situated younger white employee" Sara Young differently. But Simmons points to nothing in the record indicating Young's race. There is also no evidence in the record regarding Young's performance reviews.

We conclude Simmons did not create a genuine issue of material fact as to whether age or race was a substantial factor in the decision to terminate her employment, and affirm summary judgment dismissal of the lawsuit against Microsoft.

WE CONCUR:

---

[11] See also Weinstock v. Columbia Univ., 224 F.3d 33, 43-45 (2d Cir. 2000) (use of the words "nice" and "nurturing" to describe female assistant professor during tenure proceedings was not evidence that university's proffered reason for terminating her was pretext for sex discrimination).